## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**KENDALL GORDON**                                         **CIVIL ACTION**

**versus**                                                 **NO. 12-2708**

**N. BURL CAIN, WARDEN,**                                  **SECTION: "R" (1)**
**LOUISIANA STATE PENITENTIARY**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. <u>See</u> 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Kendall Gordon, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana. In a bench trial on June 22, 2010, he was convicted of second degree murder under Louisiana law.[1] On August 5, 2010, he was sentenced to a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[2] On August 19, 2011,

---

[1] State Rec., Vol. III of IV, transcript of June 22, 2010, p. 114; State Rec., Vol. I of IV, minute entry dated June 22, 2010.

[2] State Rec., Vol. III of IV, transcript of August 5, 2010; State Rec., Vol. I of IV, minute entry dated August 5, 2010.

the Louisiana Fourth Circuit Court of Appeal affirmed that conviction and sentence.[3] The Louisiana Supreme Court then denied petitioner's related writ application on February 10, 2012.[4]

On November 7, 2012, petitioner, through counsel, filed the instant federal application for *habeas corpus* relief claiming that there was insufficient evidence to support his conviction.[5] In its response, the state concedes that the federal application is timely and that petitioner exhausted his remedies in the state courts; however, the state argues that, under the applicable deferential standards of review, relief must be denied on the merits.[6] Petitioner has filed a reply to the state's response,[7] and the state has filed a sur-reply.[8]

## I. Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas

---

[3] State v. Gordon, No. 2010-KA-1286, 2011 WL 9160384 (La. App. 4th Cir. Aug. 19, 2011); State Rec., Vol. I of IV.

[4] State v. Gordon, 80 So.3d 469 (La. 2012) (No. 2011-K-2038); State Rec., Vol. I of IV.

[5] Rec. Doc. 1.

[6] Rec. Doc. 9.

[7] Rec. Doc. 10.

[8] Rec. Doc. 13.

'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."

Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## II. Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

> Darceleen Commadore testified that on the evening of August 8, 2009, she was at her home, 1810 Tricou Street in New Orleans, where she lived with sister, Patrice Commadore [FN1]. Her friend, Earlitta Taylor, was present in the house that night along with four children. Ms. Commadore recalled that at approximately 10:30 p.m. she was in the front room talking on the phone with her mother and that Patrice Commodore was in bed. Ms. Taylor was washing clothes. Suddenly, someone kicked the front door in. Two men with

bandanas covering their faces entered the house. They told Ms. Commadore not to move, and once she saw that at least one of the men was armed, she raised her hands above her head as the men moved past her.

> [FN1] For clarity, Darceleen Commadore will be referred to as "Ms. Commadore" and her sister, Patrice Commadore, will be referred to as "Patrice Commadore".

Ms. Commadore heard them in another room saying, "Get on the floor. [Expletive deleted], don't move." She heard them asking where the money was. She then heard commotion as the men continued to demand to know where the money was, followed by a gunshot. Seconds later, the two men came from the hallway and fell down on top of her, where she was sitting on the ground in the living room. The older man yelled at the younger to get up. The older man then grabbed her and demanded to know where the money was. They went into her room to get her purse.

Ms. Commadore's sister was lying on the floor covered in blood. Ms. Commadore stepped over her body. The older man was yelling at Ms. Commadore to hurry and stated, "[Expletive deleted], if I get caught in this house, I am going to kill you and everybody in here." Ms. Commadore could not find her own purse, but she did find Ms. Taylor's purse. While Ms. Commadore was looking for her own purse, the older subject hit her across the face several times. She told him to wait, as she was trying to remember where her purse was located. Eventually, she gave him two hundred dollars that she obtained from Ms. Taylor's purse. The men then left. Ms. Commadore ran into the street screaming, but no one was outside. Initially, she telephoned her mother and then the police.

Ms. Commadore informed the police that one of the perpetrators was named Kendall or Kendrick Gordon and that she believed he had tattoos on his face. She identified him as the younger of the two men who entered. She stated that when the men fell onto her, Kendall Gordon's bandana came off his face, and that was when she was able to identify him.

Hours after the murder, Ms. Commadore met with Detective Barrett Morton of the Homicide Division who showed her two lineups. She positively identified Kendall Gordon from the first lineup. Ms. Commadore explained that she knew Kendall Gordon

because he lived in her area.  She first met him at central lockup that year after she was arrested.  She also met him through her business selling clothes.  She knew him well enough to inform Detective Morton that he had tattoos on his face and a gap in his teeth.  Ms. Commadore stated that she did not actually observe these traits on the night in question.  Ms. Commadore examined the photographic lineup she used to identify Kendall Gordon and identified her signature on the back.

Ms. Commadore testified that at the time she identified the defendant, Kendall Gordon, he was the person whom she believed was in her house.  However, she claimed that she now knew he was not the perpetrator.  She stated that she came to this belief learned through the news media later that Jessie Bibbins had been killed and "the story started adding up."  Ms. Commadore went to the District Attorney's Office in January of 2010 and told one of the assistant district attorneys that she had identified the defendant in error.

Ms. Commadore testified that Jessie Bibbins, and not the defendant, was the younger of the two perpetrators who was in her house.  While looking at Kendall Gordon, Ms. Bibbins stated that he was not in her house on the night in question.

She acknowledged that Bibbins does not have tattoos on his face.  She explained that although she described Gordon as having three tattoos on his face, she never stated that she actually observed the tattoos on the night in question, only that she knew that Gordon had three tattoos on his face.

Ms. Commadore denied being directly threatened by any family members associated with the case but admitted that she had heard of some threats on the street.  She heard that "if this person is going to get out of jail, this person going to do me this."  Continuing, she stated, "As a matter of fact, they killed the wrong person."[FN2]

[FN2] Ms. Commadore was not asked to explain this statement further.

In order to refresh Ms. Commadore's memory regarding the color of the bandanas the perpetrators were wearing, the state played a tape of the statement Ms. Commadore gave to Detective Morton on the night of the murder.

Ms. Commadore testified that she was able to identify Jessie Bibbins in the photographic lineup only after Detective Morton all but told her whom to identify.  She explained Detective Morton went through the photographs and essentially eliminated all but one of

them, which she then identified as being that of the second perpetrator. She stated that because he told her that the photograph she selected was of the subject who was found dead, she was eighty to ninety percent sure of her identification.

Earlitta Taylor testified that she was in the kitchen when the men burst into the house. One of the men ran up to her face with a gun and told her to get on the ground. The man who came into the kitchen had a red bandana covering his face. She could hear the other man constantly telling Patrice Commadore to give him the money in the other room. Then she heard one gunshot.

Afterwards, she could hear them asking Ms. Commadore for money, and she could hear Ms. Commadore saying she did not have any money and telling them that her purse was on the bed. Then someone jumped over her, and she heard Ms. Commadore on the phone whispering.

Detective Barrett Morton, of the New Orleans Police Department, Homicide Division, testified that when he entered the house on Tricou Street, he observed that the door appeared to have been forced open. There was debris and furniture in the living room. There was a common hallway with two bedrooms on either side, and the kitchen was at the rear of the house. Detective Morton observed the deceased lying in the entryway to the bedroom on the left. The opposite bedroom appeared to be a child's bedroom.

Detective Morton identified several photographs taken of the scene. One depicted a blood trail leading from the common hallway and out of the front door. Another photograph depicted a forty caliber handgun that was found on the floor just inside the doorway of the child's bedroom. Two nine millimeter casings were also recovered at the scene. One was recovered from the blood pool next to the victim.

Detective Morton did not speak with Ms. Commadore until approximately one and a half to two hours later, at the Homicide Office. Based on the information provided by Ms. Commadore, Detective Morton prepared a photographic lineup that included Kendall Gordon's photograph. He also prepared a second lineup containing a photograph of Jessie Bibbins, the believed co-perpetrator, who was found in another part of the Ninth Ward, about three miles away, shot to death about the same time as the incident on Tricou Street was being reported. Detective Morton left the house on Tricou Street and proceeded to the scene of the Bibbins homicide. He identified a photograph of Bibbins' body taken at the scene of his homicide.

Detective Morton testified that when shown the photographic lineup, Ms. Commadore positively identified Kenneth [sic] Gordon as the perpetrator. When shown the lineup containing Jessie Bibbins, she identified him and stated that he looked like he was the older one of the two and that she was about ninety percent sure of her identification, even though he appeared younger in the photograph. Detective Morton denied suggesting which of the photographs she should identify. After examining the rap sheets of Messrs. Gordon and Bibbins, Detective Morton confirmed that the two men were approximately the same age.

It was stipulated that had Dr. Garner testified, she would have confirmed that she conducted the autopsy of Patrice Commadore, and that she would have testified that she found the cause of death to be a gunshot wound to her skull and brain.

A second stipulation was entered that had New Orleans Police Department firearms examiner, Kenneth Leary, testified, he would have confirmed that the nine millimeter bullet recovered during Patrice Commadore's autopsy and the nine millimeter bullet recovered from Jessie Bibbins' autopsy were fired from the same weapon.

August Gaines testified for the defense. He admitted having two convictions for theft, involving an automobile and a license plate. He stated that on the night in question, he saw the defendant, Kendall Gordon, at a bus stop at Canal and Basin Street at approximately 10:30 p.m. Gaines was on his way home from work. He and the defendant are good friends, as his girlfriend's brother dates Mr. Gordon's sister. The two spoke briefly before going their separate ways.

Mr. Gaines saw the defendant the next morning at Gordon's sister's apartment. He stated that Gordon was hysterical. Gordon related that he had learned that he was wanted in connection with a murder that had occurred the previous evening. Gaines then pointed out that he had seen him the previous evening at the same time as the murder was alleged to have occurred and could establish his innocence.

At the conclusion of the trial, the trial court charged itself. In rendering its verdict the court explained that it found Detective Morton to be more credible than Ms. Commadore and that he believed that Ms. Commadore had retracted her identification out of fear of reprisal.[9]

_____

[9] State v. Gordon, No. 2010-KA-1286, 2011 WL 9160384, at *1-4 (La. App. 4th Cir. Aug. 19, 2011); State Rec., Vol. I of IV.

## III.  Petitioner's Claim

Petitioner claims that there was insufficient evidence to support his conviction.  In the last reasoned state court judgment addressing that claim, the Louisiana Fourth Circuit Court of Appeal denied the claim, holding:

> As his sole assignment of error, the defendant contends that the evidence produced by the State at trial was insufficient to support his conviction.  Specifically, the defendant argues that Ms. Commadore's recanted identification is insufficient to support his conviction for second degree murder.
>
> The standard of review for the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781 (1979).  When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."  This statutory test works with the Jackson constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational trier of fact.  State v. Rosiere, 488 So.2d 965, 968 (La. 1986).
>
> When the key issue in the case is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof.  State v. Bright, 1998-0398 (La. 4/11/00), 776 So.2d 1134, 1147.  A five-factor test for testing the reliability of an identification was enunciated in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375 (1972):  (1) the witness' opportunity to view the assailant at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the assailant, (4) the witness' demonstrated level of certainty, and (5) the time lapse between the crime and the confrontation.
>
> Although the defendant does not suggest that Ms. Commadore's initial identification should have been suppressed as unreliable under the Biggers factors, review of the circumstances of the identification reflects that Ms. Commadore related that she obtained an unobstructed view of the defendant's face when his

bandana came down from around his face during the struggle. There is no indication that the lighting was poor or that any other factors interfered with her ability to see the defendant who it appears was only a few feet away when she observed his facial features. Ms. Commadore recognized the defendant immediately, and she identified his photograph from a lineup within hours of the crime. Accordingly, Ms. Commadore's identification is reliable under the <u>Biggers</u> factors.

The <u>Jackson</u> standard also guides appellate review on issues of witness credibility, as this court discussed in <u>State v. Holmes</u>, 05-1248, pp. 8–9 (La.App. 4 Cir. 5/10/06), 931 So.2d 1157, 1162:

> The fact-finder weighs the respective credibilities of the witnesses, and a reviewing court will generally not second-guess those determinations. <u>State ex rel.</u> <u>Graffagnino v. King</u>, 436 So.2d 559 (La. 1983). However, the touchstone of <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) is rationality and that "irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." <u>State v. Mussall</u>, 523 So.2d 1305, 1310 (La. 1988). The trier of fact makes credibility determinations, and may, within the bounds of rationality, accept or reject the testimony of any witnesses. <u>State v. Hampton</u>, 98-0331 (La. 4/23/99), 750 So.2d 867, 880.

The defendant contends that the evidence was insufficient to support his conviction for the murder of Patrice Commadore and that his conviction should be overturned because the only eyewitness testified that he did not commit the crime and because no physical evidence was introduced which linked him to the murder. The defendant acknowledges that the trial court was free to disbelieve Ms. Commadore's trial testimony that she then believed Jessie Bibbins was the perpetrator; however, the defendant argues that finding Ms. Commadore's testimony less than credible does not constitute substantive evidence of guilt and left the court with no evidence on which to support its verdict.

Citing State v. Cousins, 96-2973 (La. 4/14/98), 710 So.2d 1065, the defendant argues that the conviction cannot be supported by either the impeachment value of Detective Morton's testimony or by Ms. Commadore's initial unsworn statement that Kendal [sic] Gordon was one of the men who killed her sister. Because the defendant invokes Cousins, some discussion of the facts of the case is necessary.

In Cousins, the state attempted to elicit testimony from a friend of the defendant that the defendant had admitted his involvement in the robbery and murder of the victim. The witness denied that the defendant had made the statement; however, he did not expressly deny having told the police that the defendant had made the statement. The witness asserted that he had told police only "what his lawyer and the police told him to say in order to receive favorable treatment on pending charges." Id. The prosecution then called the defendant's lawyer, his sister and a policeman ostensibly to impeach the witness. The contents of the witnesses' statement that the defendant had admitted his involvement in the crime were presented to the jury, and during closing argument the state argued the substance of the defendant's confession. The Louisiana Supreme Court found the prosecutor improperly used the friend's hearsay statement to prove the defendant's guilt, that this error was not harmless, and reversed the conviction.

In State v. Collins, 01-1459 (La.App. 4 Cir. 8/21/02), 826 So.2d 598, as here, the defendant cited Cousins for the proposition that an eye witnesses' prior inconsistent statement was not admissible as substantive evidence of guilt. In Collins, an eyewitness to a murder denied informing either of two officers that the defendant was the gunman. In response, the State recalled the two officers who related the witness's prior statement identifying the defendant as the gunmen. This court's lengthy and reasoned discussion of the complex issues involving whether the witness's statement constituted inadmissible hearsay and whether the statement could be introduced as substantive evidence of guilt, rather than solely as impeachment evidence, is pertinent to the present discussion. This Court stated:

> In Cousin, the prior statements were inadmissible hearsay because the statements purportedly made by the defendant to his friend did not fall within the narrow exception provided in La. C.E. art. 801(D)(1)(a) for prior inconsistent statements "given under oath." In contrast, Ms. Gould's prior

statements are not hearsay because her statements fall within the exception provided by La. C.E. art. 801(D)(1)(c) for prior identifications. This distinction renders <u>Cousin</u> inapposite.

This distinction between the prior statements at issue in this case as opposed to those in <u>Cousin</u> arises as a result of the "quite different criteria controlling when these statements [by a witness (prior inconsistent statements and prior identifications)] fall outside the hearsay rule." Graham C. Lilly, <u>An Introduction to the Law of Evidence</u> § 53 (1978). As noted, in <u>Cousin</u>, the prior inconsistent statement was hearsay because it was not made under oath. In contrast, "[a] prior identification is considered outside the hearsay rule if no more is shown than that the testifying witness, now subject to cross-examination, made an earlier identification of the person in question after perceiving him.'" <u>Lilly</u>, *supra.*

As noted, La. C.E. art. 801(D)(1)(c), which conforms with its federal counterpart, is the pertinent evidentiary rule that governs prior identification statements; this rule provides that a witness' prior statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement," and the statement is "[o]ne of identification of a person made after perceiving the person." La. C.E. art. 801(D)(1)(c). Although another circuit has narrowly construed this rule as applying solely to statements made in the context of an identification procedure, the rule has been applied to prior statements of identification "made in a wide range of circumstances." 29 Am.Jur.2d Evidence § 678; George W. Pugh, *et al.*, <u>Handbook on Louisiana Evidence Law</u> 519 (2002 ed.) (noting authors' tendency to agree with broader construction adopted by federal courts and citing as illustrative <u>U.S. v. Brink</u>, 39 F.3d 419 (3d Cir. 1994)). In <u>State v. Johnson</u>, 99-3462 (La. 11/3/00), 774 So.2d 79, the Supreme Court quotes the <u>Brink</u> case with approval, stating: "'If at trial the eyewitness fails to remember or denies that he made the identification, the previous statements of the eyewitness can be proved by

testimony of a person to whom the statement was made, and the statement can be given substantive effect.'" Johnson, 99-3462 at pp. 2-3, 774 So.2d at 80 (quoting Brink, *supra*). We adopt that broader construction of the rule.

In Johnson, *supra*, the Supreme Court further notes that La. C.E. art. 801(D)(1)(c)'s rule regarding prior identifications is an exception to the general rule discussed in Cousin that a witness' prior inconsistent statements is not admissible as substantive evidence; specifically, the Court states:

> When a non-party witness's credibility is attacked through prior inconsistent statements incriminating the accused, the evidence is generally not admissible for its assertive value as substantive evidence of guilt.... Cousin, 96-2673 at pp. 8–9, 710 So.2d at 1069. An exception to this general rule exists for cases in which the witness's prior inconsistent statement also constitutes a prior statement of identification for purposes of La. C.E. art. 801(D)(1)(c), Louisiana's counterpart of Fed. R. Evid. 801(d)(1)(C).

Johnson, 99-3462 at p. 2, 774 So.2d at 80. Such statements of identification are, by statute, defined as non-hearsay.

Illustrating what constitutes a statement of identification, a commentator states:

> When A testifies that on a prior occasion B pointed to the accused and said, "That's the man who robbed me," the testimony is clearly hearsay. If, however, B is present in court, testifies on the subject of identity, and is available for cross-examination, a

case within the present section is presented.

2 John William Strong, <u>McCormick on Evidence</u> § 251 (4th ed. 1992). Obeying the traditional hearsay formula such prior identifications would be hearsay; "[a] pre-trial assertion ... that identifies the accused as the person who committed the act charged normally is offered for its truth and thus is hearsay." <u>Lilly</u>, *supra* at § 52.

In excluding statements of identification from the hearsay rule, Congress cited two perceived problems it was attempting to remedy; to wit:

> (1) the typical situation where the witness's memory no longer permits a current identification and he therefore can only testify as to his previous identification; and

> (2) the instance where before trial the witness identifies the defendant and then because of fear refuses to acknowledge his previous identification.

3 Michael H. Graham, <u>Handbook of Federal Evidence</u> § 801.13 (5th ed. 2001) (quoting <u>U.S. v. Milton</u>, 8 F.3d 39, 47 (D.C. Cir. 1993) (quoting 121 Cong. Rec. 31, 866-67 (Congressman Hungate and Wiggins)).

In the second situation, "'the witness's prior identification can only be introduced into evidence by a third party who was present at the original identification.'" <u>Graham</u>, *supra*. The rule thus contemplates that the declarant will not remember or deny making a prior statement, and "testimony of any person who was present, for example a police officer, is also admissible." <u>Graham</u>, *supra*. As the court noted in <u>Brink</u>, "'If at trial the eyewitness fails to remember or denies that he made the identification, the previous statements of the eyewitness can be proved by the testimony of a person to whom the statement was made, and the statement can be given

substantive effect.'" 39 F.3d at 426 (quoting Jack B. Weinstien and Margaret Berger, Weinstein's Evidence ¶ 801(d)(1)(C)[01], at 801-222 (1993)).

The second situation was presented in this case, as evidenced by Ms. Gould's own testimony that in the interim between the shooting and trial she became aware of neighborhood gossip that she supposedly had told the police that Mr. Collins was the gunman and that as a result she "was put in a very uncomfortable position." The testimony of Detective Bowen, Officer Eddington, and Ms. Lewis fall within the exception for statements of identification set forth in La. C.E. art. 801(D)(1)(c). Hence, Ms. Gould's prior statements of identification were not hearsay and were properly admitted through those three witnesses as substantive evidence.

State v. Collins, pp. 22-25, 826 So.2d at 613-15.

As the foregoing discussion on the admissibility and evidentiary value of out of court statements of identification demonstrates, Ms. Commadore's identification of Kendall Gordon as the perpetrator was not hearsay and was admissible as substantive evidence of guilt.

The defendant also relies on State v. Jones, 610 So.2d (La. 1992) (*per curiam*), where the Louisiana Supreme Court reversed the defendant's conviction that was based entirely on an eyewitness's pre-trial identification. The defendant cites the Court's language acknowledging that, "[w]hen the state's case rests entirely on evidence of out-of-court assertions of fact ... this Court is not precluded from inquiring into the reliability of the result for due process purposes under Jackson v. Virginia." Jones, 610 So.2d at 784.

Briefly, Jones involved the armed robbery of a convenience store. The two perpetrators were observed fleeing the store, entering a vehicle, and driving away. A cab driver who was positioned across the street saw the men flee the store and followed the getaway car until it darted into the Calliope project. The cab driver radioed a description of the vehicle to his dispatcher, as well as a complete license plate number, and a direction of flight. Subsequently, police gave chase to a vehicle which matched the general description of the getaway car, but whose license plate number did not match the information provided by the eyewitness. After the vehicle was pulled

over, three men bolted from the car and two subjects were eventually apprehended after an ensuing foot chase. One was the man wearing a brown leather jacket and the other was wearing a blue windbreaker. For reasons not discussed in the opinion, only the man wearing the brown leather jacket, Jackson, was returned to the store for possible identification. The store clerk was unable to identify the subject; however, the cab driver did positively identify Jackson.

Two weeks later, police showed the store clerk a photo lineup of the second subject, Jones, who was wearing the blue windbreaker when he was apprehended. The store clerk thought Jones looked similar to one of the robbers but could not make a positive identification. The cab driver made a positive identification of Jones from the lineup.

At trial, the cab driver completely surprised the State when he exculpated Jackson, the man he identified at the store, by pointing to Jones as the man he identified on the night of the offense. The jury acquitted Jackson but convicted Jones. In its opinion, the Court also discussed in detail other substantial discrepancies between the initial descriptions of the perpetrators provided by the cab driver and the men who were apprehended, which further case doubt on the accuracy of the cab driver's identification of Jones.

In finding the evidence was insufficient to support Jones' conviction, the Court also looked to the fact that cab driver had but a fleeting glimpse of the perpetrators as they fled from the store as well as the fact that the license plate number of the vehicle that was stopped did not coincide with the information which the cabdriver gave to his dispatcher.

Accordingly, the court concluded that because "no rational trier of fact could have found the [cab driver's] in-court identification of relator credible" ("a point the prosecutor did not even argue in closing") the case necessarily rested on the cab-driver's out-of-court identification, "which gave the jury no rational basis for concluding had any more reliability than his in-court testimony." Jones, 610 So.2d at 784-85. Ultimately, these circumstances caused the Court reverse the conviction after concluding that "a rational trier of fact would necessarily have a reasonable doubt as to relator's guilt."

On its facts Jones can be distinguished as the circumstances of the present case did not present the same level of grave concern that surrounded Jones's conviction. Significantly, Jones involved the identification of a total stranger, while the current case involved the recognition of a previous acquaintance. Ms. Commadore testified that she was well acquainted with the defendant prior to the incident

and knew him by name. Ms. Commadore recognized Gordon during the commission of the offense and immediately identified him to the police as the perpetrator. She subsequently confirmed her identification by selecting Gordon in a photographic lineup while noting that she was one hundred percent positive of her identification. Furthermore, there is no indication from the testimony that there is any resemblance between Bibbins and Gibson [sic] such that a rational trier of fact should have questioned whether Commadore may have been mistaken in her belief on the night of her sister's murder that she recognized the defendant as the murderer.

As noted by the State, courts have affirmed a number of convictions which were partially supported by identifications that later were retracted; however, we note that those cases involved other supporting evidence. In Jones, the Court cited State v. Allen, 366 So.2d 1308 (La. 1978), in support of the statement that "[w]hen the state's case rests entirely on evidence regarding out-of-court assertions of fact ... this Court is not precluded from inquiring into the reliability of the result for due process purposes under Jackson v. Virginia." The facts of Allen were presented succinctly by the Court in its decision as follows:

> The testimony at trial revealed the following facts. Two minor teen-aged girls were arrested for shoplifting and possession of marijuana on December 29, 1976. In exchange for immunity from prosecution on both charges, they agreed to make statements revealing the source of the marijuana. One minor stated that she purchased a "bag" of marijuana from the defendant. In her statement the other minor asserted that the defendant had given her the two marijuana cigarettes found on her at the time of her arrest. When called by the state to testify at defendant's trial, each girl admitted that she had made an earlier statement implicating the defendant. However, each of them denied the truth of the respective statements. The first girl testified that she made the statement only because of pressure from the deputies and her family, while the second indicated that her statement was motivated by the offer of immunity from the charges of shoplifting and possession of marijuana. The trial judge found the girls to be hostile witnesses and allowed the state to

impeach the in-court testimony with the prior inconsistent statements which implicated the defendant. There was no request from the defendant that a limiting instruction be given the jury. Each witness had admitted having made the earlier statement but testified that it was false, that defendant had not sold or given either of them the marijuana.

Id., 366 So.2d at 1310.

Ultimately, in reversing Allen's conviction, the Court ruled:

[U]nobjected to hearsay which is the exclusive evidence of a defendant's guilt of the crime or an essential element thereof, and where contradicted at trial by the sworn recantation of the out-of-court declarant, is no evidence at all.

366 So.2d at 1312.

However, in the instant case, as discussed above, Ms. Commadore's identification shortly after her sister's murder was not inadmissible hearsay.

Ms. Commadore's testimony concerning the possibility of reprisal against her, based on comments she heard on the street about what "people" might do to her, while not clear and indisputable testimony that her recantation was the result of fear of reprisal, we cannot say that the trial court was unreasonable in inferring from her testimony that this was the case.

After the defendant filed his appeal brief, the State supplemented the record with a copy Ms. Commadore's tape recorded statement. The defendant then filed a supplemental brief wherein he suggests that the tape recorded statement further confirms and supports Ms. Commodore's belief that she was mistaken in her identification of Kendall Gordon. However, at the conclusion of the trial, the trial court commented that the taped statement "had no substantive value at all." The court stated: "As a matter of fact, it is so inaudible I couldn't understand it. I didn't understand it." Because the taped statement was played only to refresh Ms. Commadore's recollection regarding the color of the two bandanas, and because the trier of fact could not understand the contents of the tape, it is irrelevant to our resolution of defendant's assignment of error.

Our review of the tape recording shows that Ms. Commadore's statement varies slightly and immaterially from her trial testimony in that she states that after she heard the gunshot the older of the two men threw the younger one out of the bedroom and onto the floor where she was sitting. As he did so, they both fell. She states that the older one then yelled at the younger one to "Get the [expletive deleted] up." He then threw him out of the room to leave. Apparently, the younger one left the house at this point as there is no further mention of him. As she testified at trial, the older one then picked her up, took her into the room to search for the money, and struck her several times. In the tape, it is reasonably clear that Kendall Gordon is the younger of the two subjects. At trial, Ms. Commadore testified that both men fell onto her.

As at trial and on the tape, Ms. Commadore stated that while the two men were struggling, Kendall Gordon's bandana came off which enabled her to identify him.

The defendant contends that it is unreasonable to conclude that it was Jessie Bibbins who was the subject who threw Kendall Gordon to the floor, and who subsequently picked Ms. Commadore up from the floor, because it was well established that Bibbins was shot during the incident and subsequently, it appears, perished from his wounds. Accordingly, the defendant contends that the only reasonable explanation is that Jessie Bibbins was the younger subject who was on the ground and was thrown out of the living room and the house.

However, as the interview continues, the focus turns to Jessie Bibbins, and it is reasonably clear from Ms. Commadore's account that she was quite sure that it was Bibbins who took her into the room to look for the money and who struck her several times. During the interview, Ms. Commadore also states that the she was able to identify Bibbins because his bandana came off when the two men struggled with each other. Although Ms. Commadore never actually suggested that both men's bandanas fell off during their struggle, she testified that she was able to tell that one of the men was older and one was younger because she saw their faces.

It should also be noted that in the tape, it appears that Ms. Commadore states that she believed that Kendall Gordon had been shot. She appears to state that she believed that the older one shot the younger one because of the way he picked the younger one up and was yelling at him. The tape does not establish with certainty whether or not Ms. Commadore believed that Kendall Gordon was the one who had been shot, because the tape becomes inaudible at

critical moments and both Detective Morton and Ms. Commadore used unattributed pronouns throughout the statement.

The defendant also points out that, at the suppression hearing, Ms. Commadore related that the subject that fell on her left blood on her. This would lend further support to the theory that it was Bibbins who was thrown to the floor and not Gordon, which in turn suggests that Ms. Commadore was actually mistaken when she identified Kendall Gordon as the younger of the two men. However, at trial, Ms. Commadore testified that both men essentially fell on top of her when they tumbled out of the room. Accordingly, from her trial testimony, the presence of blood on Ms. Commadore is not significant as either of the two men could have been the source of the blood.

Finally, essentially no evidence was introduced regarding Jessie Bibbins' injuries. Accordingly, it is difficult to conclude that he was or was not the subject who pulled Ms. Commadore up from the floor and who took her into the bedroom. Ultimately, this is the crux of the defendant's supplemental argument, as it were, that a rational trier of fact should have believed that Ms. Commadore was actually mistaken in her identification, because it was unlikely that Bibbins, who was injured, would have had the strength to proceed as Ms. Commadore suggested he did. However, viewing the evidence in the light most favorable to the State, one cannot conclude that Bibbins must have been the younger of the two and that Ms. Commadore was mistaken when she told the police that she recognized Kendall Gordon as one of the two perpetrators.

From the outset, Ms. Commadore identified the defendant, a person to whom she was acquainted, as one of the perpetrators of her sister's murder. Later, she recanted her identification for reasons which she could never fully explain. Upon our review of the record in its entirety, in the light most favorable to the prosecution, we cannot say that the defendant's due process rights have been adversely affected, nor that the trial court's verdict was not reasonable and in accord with the foregoing standards of review.[10]

---

[10] State v. Gordon, No. 2010-KA-1286, 2011 WL 9160384, at *4-12 (La. App. 4th Cir. Aug. 19, 2011); State Rec., Vol. I of IV.

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[11]

Because sufficiency of the evidence claims present a mixed question of law and fact, this Court must defer to the state court's decision rejecting petitioner's claim unless he shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000).

The state court's decision obviously is not "contrary to" the clearly established federal law set forth in the jurisprudence of the United States Supreme Court. Regarding the "contrary to" clause of § 2254(d)(1), the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Here, the state court identified and applied the controlling United States Supreme Court precedent, Jackson v. Virginia, 443 U.S. 307 (1979). Further, the parties have not identified, and this Court has not located, a United States Supreme Court decision with "materially indistinguishable" facts.

---

[11] State v. Gordon, 80 So.3d 469 (La. 2012) (No. 2011-K-2038); State Rec., Vol. I of IV.

The much closer question, however, is whether the state court's decision constituted an "unreasonable application" of <u>Jackson</u>. Regarding the "unreasonable application" clause of § 2254(d)(1), the United States Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

<u>Williams v. Taylor</u>, 529 U.S. 362, 407 (2000). The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams</u> that an unreasonable application is different from an incorrect one." <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002); <u>see also</u> <u>Puckett v. Epps</u>, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."), <u>cert. denied</u>, 132 S.Ct. 1537 (2012).

Where, as here, a federal *habeas* court is confronted with a <u>Jackson</u> claim, its review is particularly strict and narrow. As the Supreme Court has explained, the "critical inquiry" under <u>Jackson</u> is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 318. However, the Supreme Court expressly cautioned:

> [T]his inquiry does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable

doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Id. at 318-19 (quotation marks and citation omitted). The <u>Jackson</u> standard "also unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" <u>Cavazos v. Smith</u>, 132 S.Ct. 2, 6 (2011) (quoting <u>Jackson</u>, 443 U.S. at 326).[12] Therefore, like the AEDPA standard, <u>Jackson</u> standard simply does not focus on whether the decision at issue was "correct." <u>Herrera v. Collins</u>, 506 U.S. 390, 402 (1993) ("[T]he <u>Jackson</u> inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit."). Moreover, because <u>Jackson</u>'s already deferential standard must considered in tandem with the similarly deferential standard imposed by the AEDPA, this Court is faced with a particularly stringent "twice-deferential standard" of review. <u>Parker v. Matthews</u>, 132 S.Ct. 2148, 2152 (2012); <u>see also</u> <u>Coleman v. Johnson</u>, 132 S.Ct. 2060, 2062 (2012)

---

[12]   Out of an abundance of caution, this Court additionally notes that Louisiana's circumstantial evidence standard requiring that the every reasonable hypothesis of innocence be excluded does *not* apply in federal *habeas corpus* proceedings; in these proceedings, *only* the <u>Jackson</u> standard need be satisfied, even if state law would impose a more demanding standard of proof. <u>Foy v. Donnelly</u>, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); <u>Higgins v. Cain</u>, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), <u>aff'd</u>, 434 Fed. App'x 405 (5th Cir. 2011), <u>cert. denied</u>, 132 S.Ct. 1713 (2012); <u>Williams v. Cain</u>, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), <u>aff'd</u>, 408 Fed. App'x 817 (5th Cir. 2011); <u>Davis v. Cain</u>, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); <u>Wade v. Cain</u>, Civ. Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), <u>aff'd</u>, 372 Fed. App'x 549 (5th Cir. Apr. 9, 2010).

("We have made clear that Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference.").

As noted, the instant petitioner challenges the sufficiency of the evidence as it relates to his identity as the perpetrator of the crime. As he correctly argues, the *only* evidence identifying him as the perpetrator was the prior out-of-court identification made by Darceleen Commadore. Petitioner argues that evidence is insufficient to support his conviction because, although Ms. Commadore admitted at trial that she had in fact made the identification, she testified that she had since realized that the identification was erroneous and vigorously disavowed it.

While this Court is troubled by the evidence, which is clearly weak, the state court's finding that the evidence was nevertheless constitutionally *sufficient* did not constitute an *unreasonable* application of the Jackson standard for the following reasons. As explained in the state court's decision, under state law, Ms. Commadore's prior statement identifying petitioner as the perpetrator was clearly admissible because it was not hearsay and could be considered as substantive evidence of guilt. Concerning those points of state law, the Louisiana Supreme Court has held:

> A prior statement by a witness which is "[o]ne of identification of a person made after perceiving the person," is non-hearsay when the witness appears and is cross-examined on the statement. La.C.E. art. 801(D)(1)(c). Such a statement may be used assertively, as substantive evidence of guilt, and may be established through the testimony of one to whom the statement was made. This is so even if the witness denies making an identification or fails or is unable to make an in-court identification. State v. Johnson, 99-3462, pp. 2-3, 774 So.2d 79, 80-81. The federal rule is similar. See Fed.R.Evid. 801(d)(1)(C); United States v. Brink, 39 F.3d 419 (3rd Cir. 1994); United States v. Jarrad, 754 F.2d 1451 (9th Cir. 1985).

See also 5 Weinstein's Federal Evidence, (MB) § 801.23[1], p. 801-39 (2nd ed., Joseph M. McLaughlin, ed., 2002).

State v. Stokes, 829 So.2d 1009, 1010 (La. 2002); see also Foxworth v. St. Amand, 570 F.3d 414, 427 (1st Cir. 2009) ("Extrajudicial witness identifications are routinely used as substantive evidence of guilt.").  Moreover, the fact that Ms. Commadore was the *only* eyewitness to identify petitioner did not render the evidence insufficient.  Under both state and federal law, a single eyewitness identification, if found credible by the trier of fact, is constitutionally sufficient to prove identity and support a conviction.  See United States v. King, 703 F.2d 119, 125 (5th Cir. 1983); State v. Neal, 796 So.2d 649, 658 (La. 2001).  Here, the trier of fact found that Ms. Commadore's prior identification of petitioner, *an individual she recognized at the time of the crime because they were already acquainted*, was in fact credible and that her more recent disavowal was not.[13]  While this Court may well have made a different call on that credibility determination, that is of no moment because, quite simply, that call is not for this Court to make.  Where, as here, a petitioner's insufficient evidence claim turns on a credibility determination, a federal *habeas* court generally will not grant relief.  See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson [v. Virginia, 443 U.S. 307 (1979)], the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994) (A "challenge of the jury's credibility choice fails to satisfy the Jackson standard for habeas relief."); Phillips v. Cain, Civ. Action No. 11-2725, 2012

---

[13]  State Rec., Vol. III of IV, transcript of June 22, 2010, p. 114.

WL 2564926, at *14 (E.D. La. Apr. 11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012);

Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

Again, this is not to say that the evidence of petitioner's guilt was overwhelming; clearly, it was not. However, as noted, relief can be granted only where the evidence was *insufficient*, and this Court's review on that issue is severely limited, with relief being available only if the state court's decision under Jackson's deferential standard of review was *unreasonable*. Moreover, as the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added). That simply is not the case here for the reasons previously explained.

In summary, although the evidence in this case was paltry and suspect, the Court cannot say the state court's judgment finding that evidence constitutionally sufficient was an *unreasonable* application of the Jackson standard, a deferential standard which prohibits only

*irrational* findings of guilt.  Accordingly, under the AEDPA's stringent standards of review, deference is required, and relief should be denied.

## <u>RECOMMENDATION</u>

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Kendall Gordon be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[14]

New Orleans, Louisiana, this thirty-first day of January, 2013.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[14] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.